# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

JEFFREY LYNN MARLATT,      )
                                )
           Plaintiff,     )
v.                           )
                                )
(1) MURRAY COUNTY BOARD   )    Case No. 6:22-cv-168-JAR
OF COUNTY COMMISSIONERS,   )
(2) DARIN ROGERS, and      )
(3) ROBERT DALE HURT,     )
                                )
          Defendants.    )

## OPINION AND ORDER

Before the Court is the joint motion for summary judgment [Doc. 83][1] of defendants Murray County Board of County Commissioners (the "County") and Darin Rogers in his official and/or individual capacity as Sheriff of Murray County. Plaintiff Jeffrey Lynn Marlatt timely responded [Doc. 85], and the moving defendants filed a joint reply [Doc. 88].

This case arises from an inmate-on-inmate assault in which defendant Robert Dale Hurt ("Hurt") struck Plaintiff in the face with his own orthotic walking boot on October 16, 2021, while both men were confined at the Murray County Jail ("MCJ") in Sulphur, Oklahoma. Plaintiff initiated this action on June 2, 2022, alleging violations of the Oklahoma Constitution, state common law, and his federal rights under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to "42 U.S.C. §§ 1983, 1985, and 1988." [Doc. 2, § I].

---

[1] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers provided by CM/ECF.

## I.   UNDISPUTED MATERIAL FACTS [2]

It is undisputed that both Plaintiff and Hurt are members of the Chickasaw Nation. Following the United States Supreme Court's landmark decision in *McGirt v. Oklahoma*, 591 U.S. 894 (2020),[3] the Chickasaw Lighthorse Police Department ("Lighthorse") entered into a multi-year contract with the Murray County Sheriff's Office whereby MCJ agreed to accept persons arrested by Lighthorse for violations of tribal criminal law in exchange for $50.00 per day for each Chickasaw prisoner. [Doc. 83-20]. The Sheriff's Office reserved the right to refuse to house Chickasaw prisoners when MCJ reached 80% of the maximum capacity allowable by law. [*Id.* at 2].

### A.   THE ARREST AND BOOKING OF PLAINTIFF JEFFREY MARLATT

On September 1, 2021, Plaintiff was arrested by Lighthorse on charges of kidnapping, possession of a firearm by a convicted felon, vandalism, assault, and reckless conduct with a firearm. [Doc. 83-2]. Plaintiff suffered an injury to his left ankle during this arrest [Doc. 83-6 at 1], and was immediately transported to MCJ. [Doc. 83 at 8, ¶ 4, Doc. 85 at 8, ¶ 1]. As Plaintiff was under the influence of alcohol and methamphetamine at the time of arrest, it was not until the following morning

---

[2] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

[3] On July 9, 2020, the Supreme Court held that, for purposes of the Major Crimes Act, the Muscogee (Creek) Nation's Reservation was never disestablished. McGirt, *supra*, at 937-38. Relying on *McGirt*, Oklahoma state courts subsequently ruled that the reservations of the Cherokee, Chickasaw, Choctaw, and Seminole Nations were never disestablished. *See e.g.*, Bosse v. State, 2021 OK CR 30, ¶ 12, 499 P.3d 771, 774 (affirming trial court's conclusion that defendant was wrongly tried in state court because his crime was committed on Chickasaw Nation's Reservation). *McGirt* and its progeny have foreclosed the State of Oklahoma from, among other things, exercising jurisdiction over defendants who commit crimes within the approximate 33,280 square miles of "Indian country," as defined by 18 U.S.C. § 1551, in eastern Oklahoma. Consequently, tribes like the Chickasaw Nation face a modern conundrum of funding enormously expanded court systems, law enforcement agencies, prison systems, and social services.

that he noticed pain in his left ankle and notified the jail administrator, Buffy Holman ("Admr. Holman"), of said injury. [Doc. 83 at 8, ¶ 5; Doc. 85 at 8, ¶ 1]. Plaintiff was transported to the Chickasaw Nation Medical Center on September 3, 2021, where he was prescribed an orthotic walking boot to wear continuously for two weeks, with exception to sleeping and showering. [Doc. 83 at 9, ¶ 7; Doc. 85 at 8, ¶ 7].

### B.   THE ARREST AND BOOKING OF DEFENDANT ROBERT HURT

On the evening of October 16, 2021, Hurt was arrested by the Ada Police Department on charges of burglary and public intoxication. [Doc. 83 at 9, ¶ 12; Doc. 85 at 8, ¶ 1]. He was transported to MCJ by Lighthorse that same day. [Doc. 83 at 9, ¶ 13; Doc. 85 at 9, ¶ 13; Doc. 83-10]. Though Hurt was under the influence of wasp spray at the time of arrest, he did not exhibit violent behavior during transport to MCJ and was deemed fit for incarceration by the only jailer on duty that night, James Russell ("Officer Russell"). [Doc. 83-9 at 3-4 (22:22-23:16); Doc. 83-10 at 2, ¶ 9; Doc. 83-11 (Hurt Transport Video); Doc. 83-12 at 6 (26:7-17), 7 (31:12-23); Doc. 85-4 at 21 (66:16-18)].[4] After recording that Hurt was "highly intoxicated" [Doc. 85-4 at 29 (75:4-24); Doc. 85-6], Officer Russell assigned him to the "north cell" with Plaintiff and two other inmates. [Doc. 83-12 at 7-8 (31:16-32:16)]. Though Plaintiff and Hurt had previously shared a cell without incident [Doc. 83-3 at 18-19 (67:3-68:10); Doc. 83-9 at 14-16 (81:7-83:8)],[5] Officer Russell testified he would have placed Hurt in a

---

[4] Hurt had previously been booked into MCJ while under the influence of drugs or alcohol but had never engaged in physical violence. [Doc. 83 at 9, ¶ 15]. Officer Russell testified that he "never had any problems" with Hurt during their prior encounters. [Doc. 83-12 at 5 (25:8-12)].

[5] Plaintiff contends that Hurt was "talking crazy, acting crazy, screaming, and acting up" while the two men last shared a cell. [Doc. 85 at 8-9, ¶ 10; Doc. 85-3 at 4 (70:14-24), 5 (68:1-25)]. Hurt, on the other hand, testified that he and Plaintiff prayed together while they were cellmates, that he

segregated cell for detoxification purposes if one had been available. [Doc. 85-4 at 26-27 (72:3-73:9)]. He believed, however, that housing Hurt with familiar faces would be safe for all inmates within the north cell. [Doc. 83-12 at 9 (33:1-13)].

## C.   THE INMATE-ON-INMATE ASSAULT

At approximately 8:30 p.m. on October 16, 2021, Plaintiff removed his orthotic boot to either sleep or write a letter to his grandmother. [Doc. 83 at 10, ¶ 21; Doc. 85 at 9, ¶21; Doc. 83-3 at 27 (96:4-19)]. While Plaintiff disputes allegations that he "provoked" Hurt by making a whistle noise after being asked to stop,[6] the record indicates that Hurt struck Plaintiff once in the face with the orthotic boot. [Doc. 83-3 at 24-26 (93:19-95:13), 29-31 (99:13-101:7); Doc. 83-9 at 7-9 (36:18-39:17); Doc. 83-13; Doc. 83-14]. Officer Russell promptly responded to inmates yelling for assistance, removed Hurt from the north cell, and alerted dispatch to summon EMS. [Doc. 83-14]. Hurt was then placed in a restraint chair to await a facility transfer. [*Id.*].

Plaintiff arrived at Arbuckle Memorial Hospital at 9:03 p.m. on October 16, 2021, presenting with severe facial injury and closed head trauma. [Doc. 83-6 at 1]. After an emergency surgery for initial nasal reconstruction, Plaintiff was released to the care of accompanying guards. [*Id.* at 2]. He underwent an additional nasal reconstruction surgery at the Tecumseh Campus of Norman Regional System on

---

considers Plaintiff a friend, and that he "loved [Plaintiff] to death." [Doc. 83-3 at 18-19 (67:3-68:10), 20-21 (71:18-72:6); Doc. 83-9 at 13-15 (80:13-82:2), 15 (82:10-21)].

[6] Hurt testified that Plaintiff was "scraping" his albuterol inhaler on the cell floor, making a "whistling" sound. [Doc. 83-9 at 8 (37:3-24), 10 (39:7-16)]. Hurt asked Plaintiff to stop, as he perceived Plaintiff's conduct to be "witchcraft[]." [*Id.* at 9 (38:5-10)]. Plaintiff abided by Hurt's request for a moment, but then scraped his inhaler on the floor "twice more." [*Id.* at 9 (38:11-15)]. Hurt then "grabbed the [orthotic] boot" and hit Plaintiff once in the face because he had "attacked [Hurt] with a spiritual whistle." [*Id.* at 9 (38:18-23)].

November 9, 2021. [*Id.* at 7]. Prior to the attack, there were no instances of anyone at MCJ taking possession or control of Plaintiff's orthotic boot [Doc. 83 at 9, ¶ 8; Doc. 85 at 8, ¶ 8], and Plaintiff testified he was never concerned the boot could be used as a weapon against him. [Doc. 83-3 at 27-28 (96:12-97:8)]. The boot was not returned to Plaintiff following Hurt's assault. [Doc. 83-6 at 2].

## II.   PROCEDURAL HISTORY

On September 24, 2024, the Court held an in-person hearing on the moving defendants' pending motion for summary judgment to resolve, among other things, a lack of clarity in Plaintiff's complaint. [Doc. 93].

### A.   SUMMARY OF CLAIMS ASSERTED BY PLAINTIFF

The complaint asserts an indistinct number of state and federal claims against seven defendants. Plaintiff has since dismissed four defendants – Kent McKinley, Colt Williams, Darrell Hudson, and Murray County Jail. [Doc. 60; Doc. 82].[7] The remaining defendants are the County, Sheriff Rogers, and Hurt. Though Hurt has not moved for summary judgment, this Order will briefly discuss the claims (if any) pled solely against Hurt.[8]

### 1.   No Remaining Claims under State Law

Plaintiff alleges in his complaint that all seven defendants violated his rights under article II, § 30 of the Oklahoma Constitution. [Doc. 2, § XI]. The complaint also suggests a negligence claim against the Sheriff for violation of his duties under Okla.

---

[7] The remaining parties expressly consented to the complete jurisdiction of the undersigned U.S. Magistrate Judge on March 26, 2024. [Doc. 73]. *See* 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73(a).

[8] The Court notes that, at the motion hearing on September 24, 2024, counsel for Plaintiff was unable to define any purported claim(s) asserted against Hurt in this action. *See*, *infra*, § V.

Stat. tit. 57, § 52. [*Id.*, § XV]. During the motion hearing on September 24, 2024, however, Plaintiff voluntarily dismissed all state-law claims asserted against the County and Sheriff Rogers, without objection.

### 2. Remaining Claim under Federal Law

While originally claiming all seven defendants violated his rights under the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 [*Id.*, §§ I, X], Plaintiff has since conceded that he has no claims under §§ 1985 and 1988. [Doc. 85 at 8]. Thus, Plaintiff's only remaining federal claim is against the County and Sheriff Rogers for violation of his constitutional right to be free from punishment as a pretrial detainee. Plaintiff seeks actual and punitive damages under § 1983 as compensation for past and future medical expenses, physical and emotional pain and suffering, loss of earnings, attorney fees, and court costs. [Doc. 2, § XVII].

### B. JOINT MOTION FOR SUMMARY JUDGMENT

Plaintiff's complaint is not a model of clarity, and the moving defendants identify a number of supervening issues in their summary judgment motion. The moving defendants are correct that it is unclear from the complaint whether Plaintiff is asserting a § 1983 claim against the Sheriff in his individual capacity, official capacity, or both. [Doc. 83 at 14; *id.* at 25 (noting "Plaintiff has *not* made any supervisory liability claim against the Sheriff.")]. In return, Plaintiff asserts for the first time in his summary judgment response that "Sheriff Roger's liability arises from his personal involvement of supervisor responsibility [sic]." [Doc. 85 at 20]. In

the section preceding such assertion, however, Plaintiff refers to this action as an "official-capacity lawsuit." [*Id*. at 15].[9]

Consequently, the moving defendants argue that the County and Sheriff Rogers, in his official and/or individual capacity, are not liable on Plaintiff's § 1983 claim because (1) Plaintiff's constitutional rights were not violated; (2) Plaintiff cannot prove an official jail policy or custom caused the alleged constitutional deprivation; and (3) Plaintiff cannot establish a failure to train. Sheriff Rogers argues in the alternative that, to the extent Plaintiff purports to hold him personally liable under § 1983, he is entitled to qualified immunity in his individual capacity. And the County contends it is not a proper party if Plaintiff is suing the Sheriff is his official capacity only. [Doc. 83 at 20; Doc. 88 at 13].

In response, Plaintiff initially argues the County is a proper party because this action is brought against Sheriff Rogers as the final policymaker for MCJ. [Doc. 85 at 16]. He then contends, however, that the County is distinctly liable under § 1983 for its own actions and inactions with respect to the county commissioners' control over jail funding and authority to contract with entities like the Chickasaw Nation. [*Id*. at 17-19]. Plaintiff further argues that Sheriff Rogers violated his constitutional rights by permitting chronic overcrowding and understaffing at MCJ, by maintaining a custom of allowing jailers to disregard official jail policies and procedures, and by failing to adequately train jailers like Officer Russell. [*Id*. at 21-25].

---

[9] Though the Court inquired into this issue during the motion hearing on September 24, 2024, counsel for Plaintiff was unable to provide any further clarity. This uncertainty requires the Court to unravel herein the distinctions between individual and official capacity claims under § 1983.

### III.   GOVERNING LEGAL STANDARDS

#### A.   MOTION FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(a)</u>. Material facts are those facts that might affect the outcome of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine' when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. At the summary judgment stage, the Court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" <u>Tolan v. Cotton</u>, 572 U.S. 650, 656 (2014) (*quoting* <u>Anderson</u>, 477 U.S. at 249). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" <u>Id</u>. (*quoting* <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (*quoting* <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288 (1968)).

#### B.   SUBSTANTIVE REQUIREMENTS FOR CLAIMS UNDER 42 U.S.C. § 1983

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law. <u>42 U.S.C. § 1983</u>. Accordingly, a successful § 1983 plaintiff must show: (1) that a right secured by the Constitution or laws of the United States

was violated, and (2) "that the alleged violation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

### 1.   Official Capacity Liability

An official capacity suit is, in all respects other than name, to be treated as a suit against the entity. Griess v. Colorado, 841 F.2d 1042, 1045 (10th Cir. 1988); *see* Martinez v. Beggs, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [plaintiff] brings a claim against [the sheriff] in his official capacity, it is the same as bringing a suit against the county."). The Supreme Court has recognized, however, that a municipality "may not be held liable under § 1983 solely because it employs a tortfeasor." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, ("Brown") 520 U.S. 397, 403 (1997); Brown v. Montoya, ("Montoya") 662 F.3d 1152, 1164 (10th Cir. 2011) ("Section 1983 does not authorize liability under a theory of respondeat superior."). A municipality is liable under § 1983 only when the constitutional injury can fairly be said to have been caused by its own official policy or custom. Monell, 436 U.S. at 694.

"The 'official policy' requirement was intended to distinguish between acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 770

(10th Cir. 2013). A successful § 1983 plaintiff must "show that the policy was enacted or maintained with deliberate indifferent to an almost inevitable constitutional injury." Id. at 769. The "deliberate indifference" requirement has three elements: (1) official policy or custom, (2) causation, and (3) state of mind. Id. at 769-71.

### 2. Individual Capacity / Supervisory Liability

Individual-capacity suits seek to impose personal liability upon a government official for actions taken under color of state law. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citations omitted). Thus, "an award of damages against an official in his [individual] capacity can be executed only against the official's personal assets." Id. at 166. If prison officials are sued under § 1983 in their individual capacity based on a theory of supervisory liability, as may be the case here, the plaintiff must demonstrate the defendant-official personally violated his constitutional rights. *See* Keith v. Koerner, 843 F.3d 833, 837 (10th Cir. 2016). To successfully do so, the plaintiff must show an "affirmative link" between the defendant-official's challenged conduct and the alleged deprivation. Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013) (*quoting* Dodds v. Richardson, 614 F.3d 1185, 1196 (10th Cir. 2010)). The "affirmative link" requirement has three elements: (1) personal involvement, (2) causation, and (3) a culpable state of mind. Ibid.

### 3. Qualified Immunity

Application of the summary judgment standard slightly differs where, as here, an individual defendant asserts the affirmative defense of qualified immunity. Qualified immunity protects government officials from liability for harm caused by

reasonable mistakes. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted). When qualified immunity is asserted in the context of a motion for summary judgment, evidence beyond the allegations in the complaint is considered and the summary judgment standard detailed above is applied. *See* Ashcroft v. Iqbal, 556 U.S. 662 (2009). Courts analyzes a defendant's entitlement to qualified immunity through a two-pronged inquiry in which either prong may be considered first. *See* Pearson, *supra*, at 236. To overcome this defense, the plaintiff bears the burden of establishing that the defendant violated a clearly established constitutional right. *See* Dist. of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018). In this regard, the Court considers: (1) "whether the facts that a plaintiff has … shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, *supra*, at 232 (citation omitted). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Courtney v. Okla. ex rel. Dep't of Pub. Safety, 722 F.3d 1216, 1222 (10th Cir. 2013).

### 4. Claims under § 1983 for Failure to Protect

The Eighth Amendment applies only after an adjudication of guilt and does not apply directly to pretrial detainees like Plaintiff. Nevertheless, the Supreme Court and the Tenth Circuit have held that the Eight Amendment's protections apply to pretrial detainees through the Due Process Clause of the Fourteenth Amendment. *See* Bell v. Wolfish, 441 U.S. 520, 535-37 (1979); Garcia v. Salt Lake Cnty., 768 F.2d 303, 307 (10th Cir. 1985); Barrie v. Grand Cnty., Utah, 119 F.3d 862, 867 (10th Cir.

1997). If a plaintiff can establish a violation of the Eighth Amendment, he can establish his Fourteenth Amendment rights as a pretrial detainee have been violated.

The Eighth Amendment imposes a duty on jail officials to "provide humane conditions of confinement," including "taking reasonable measures to guarantee the safety of inmates." Hooks v. Atoki, 983 F.3d 1193, 1205 (10th Cir. 2020) (*quoting* Farmer v. Brennan, 511 U.S. 825, 833 (1994)). This overarching obligation includes a duty "to protect prisoners from violence at the hands of other prisoners." Ibid. (*quoting* Farmer, *supra*, at 833). The Supreme Court has held that being violently assaulted in prison is not "part of the penalty that criminal offenders pay for their offenses against society." Farmer, *supra*, at 832-34 (*quoting* Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834. To hold a municipal defendant liable for violating an inmate's right to safety, a § 1983 plaintiff must satisfy both an objective and subjective component. Ibid.

## IV.  DISCUSSION

The Court first considers whether Sheriff Rogers is entitled to qualified immunity in his individual capacity on Plaintiff § 1983 failure to protect claim, and then turns to whether Plaintiff has rebutted the moving defendants' contention that his constitutional rights were not violated.

### A. INDIVIDUAL CAPACITY LIABILITY | SHERIFF ROGERS

Plaintiff claims the Sheriff violated his clearly established right to be free from cruel and unusual punishment as a pretrial detainee, and specifically alleges that the severe injuries he sustained from an inmate-on-inmate assault directly resulted from chronic issues with overcrowding at MCJ, understaffing, and a failure to follow official jail policy. According to Plaintiff, despite having knowledge of the serious risks these alleged conditions posed to inmate safety, Sheriff Rogers made no attempt to remedy such conditions. [Doc. 85 at 21-25]. The Sheriff argues that, to the extent Plaintiff purports to hold him liable under § 1983 as a jail supervisor, he is entitled to qualified immunity.

As stated, to overcome this defense, Plaintiff bears the burden of showing that his constitutional right was clearly established at the time he alleges the Sheriff violated such right, *i.e.*, on October 16, 2021. *See* Courtney, 722 F.3d at 1222. To make this showing, Mr. Womble "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as [he] maintains." Callahan v. Unified Gov't of Wyandotte Cty., 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation marks and citation omitted). In his response opposing summary judgment, Plaintiff has identified multiple authorities that recognize an Eighth Amendment right to reasonable protection from attack by other inmates. *See* [Doc. 85 at 15]. Plaintiff has alleged far more than a failure to protect on the part of Sheriff Rogers, however, and has failed to provide any authorities pertaining to his underlying allegations of overcrowding, understaffing,

and the Sheriff's acquiescence to his jailers' custom of ignoring official jail policy. *See* Hope v. Pelzer, 536 U.S. 730, 741 (2002) (noting the contours of a clearly established right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right").

Plaintiff need not identify a case holding the exact conduct in question unlawful, but the Court's focus remains on whether the law at the time of Sheriff Roger's challenged conduct provided him with "fair notice" regarding the legality of such conduct. Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004). Though Plaintiff makes generalized allegations that conditions at MCJ necessarily increased the risk of inmate violence, he was unable to respond to the defendants' motion for summary judgment with evidence of specific acts of inmate violence occurring before October 16, 2021, to which the Sheriff was aware and deliberately ignored. In fact, in the decade leading up to the assault at issue, only a few minor tussles between inmates were recorded at MCJ. [Doc. 83-4 at 13 (109:7-17); Doc. 83-17 at 12 (60:4-15); Doc. 83-19 at 2-3]. *See* Ziglar v. Abbasi, 582 U.S. 120, 152 (2017) ("[I]f a reasonable officer might not have known for certain that the conduct was unlawful – then the officer is immune from liability.").

Under these principles, the Court must conclude that a reasonable official in the Sheriff's position would not have known, and could not have predicted, that being the supervisor of a jailer who unilaterally chose to house Plaintiff with a historically nonviolent inmate at a jail that experienced no serious inmate-on-inmate assaults within the preceding decade constituted a violation of Plaintiff's constitutional right

to be free from cruel and unusual punishment. This conclusion is further supported by the undisputed fact that Sheriff Rogers had no personal involvement in, or firsthand knowledge of, any of the events concerning Hurt's assault. *See* <u>Dodds</u>, 614 F.3d at 1195-96. Accordingly, to the extent Plaintiff purports to hold the Sheriff personally liable under § 1983, the Court finds Sheriff Rogers is entitled to qualified immunity in his individual capacity.

### B. DELIBERATE INDIFFERENCE ANALYSIS

The standard governing Plaintiff's § 1983 claim against the County and Sheriff Rogers, in his official capacity, is that of deliberate indifference. Deliberate indifference, as a standard of liability, requires more than ordinary lack of due care for a prisoner's safety; rather, the standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." <u>Farmer</u>, 511 U.S. at 836. But "only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991). As noted, to establish deliberate indifference based on a failure to protect, a § 1983 plaintiff must satisfy both an objective and subjective component.

To satisfy the objective component of a deliberate indifference claim under the Eighth Amendment, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." <u>Self v. Crum</u>, 439 F.3d 1227, 1230 (10th Cir. 2006) (*citing* <u>Farmer</u>, 511 U.S. at 834). "[T]he purpose for this requirement is to limit claims to significant, as opposed to trivial, suffering." <u>Mata v.</u>

Saiz, 427 F.3d 745, 753 (10th Cir. 2005). Consequently, courts look to the alleged injury claimed by the plaintiff and to determine "whether that harm is sufficiently serious." Ibid. This Court finds that the undisputed harm suffered by Plaintiff – severe facial injuries resulting from an inmate-on-inmate assault – is itself sufficient to satisfy the objective requirement of the deliberate indifference test.

Plaintiff must still satisfy the subjective component, which requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." Farmer, 511 U.S. at 838. It is not enough to allege that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not." Ibid. To meet the subjective requirement, Plaintiff must show that the County and/or Sheriff Rogers were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that they actually "[drew] that inference." Riddle v. Mondragon, 83 F.3d 1197, 1204 (10th Cir. 1996) (quoting Farmer, supra, at 834). Plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, supra, at 842. In sum, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. The Court first addresses Plaintiff's allegations of deliberate indifference against the County, followed by his allegations against Sheriff Rogers.

16

### 1.    As Applied to the Board of County Commissioners

The deliberate indifference standard for individuals is the same standard to be applied to the County on Plaintiff's § 1983 claim. The standard is, however, applied differently to governmental entities in two very significant respects. First, "the causation standard for governmental entity is articulated differently." Winton v. Bd. of Comm'rs of Tulsa Cnty., Okla., 88 F.Supp.2d 1247, 1257 (N.D. Okla. 2000). Second, "as applied to an individual prison official, *Farmer* instructs that the deliberate indifference standard is subjective standard requiring actual knowledge of a risk by the official." Ibid. When addressing the County's liability, however, "deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the governmental entity should have known of it." Ibid. (*citing* Barney v. Pulsipher, 143 F.3d 1299, 1308 n.5 (10th Cir. 1998)).

"A governmental entity cannot absolutely guarantee the safety of those it incarcerates." Id. at 1262. Nonetheless, "governmental entities have a constitutional duty under the Eighth Amendment to take reasonable steps to protect a prisoner's safety and bodily integrity." Id. (*citing* Berry v. City of Muskogee, Okla., 900 F.2d 1489, 1499 (10th Cir. 1990)). Governmental entities are not, however, generally responsible for constitutional violations committed by its agents or employees. Again, there is no respondeat superior liability under § 1983. For a governmental entity to be held liable under § 1983, it must have caused the harm through its own unconstitutional policies, and not merely for the acts of its employees. Monell, 436 U.S. at 694. By focusing on a policy or custom, the Court ensures that the entity "is

held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the [governmental entity]." Brown, 520 U.S. at 403-04. Thus, to hold a municipality liable, a § 1983 plaintiff must establish that "(1) he has been deprived of a constitutionally protect right, and (2) that a governmental policy or custom was the moving force behind the constitutional deprivation." Monell, 436 U.S. at 694; Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1317 (10th Cir. 1998).

Those whose edicts can fairly be said to bind a governmental entity are those officials who are responsible for establishing final policy on a given subject matter. An act by a final policymaker is an act of official government "policy." The moving defendants do not deny that Sheriff Rogers was the final policymaker for the County with regard to day-to-day operations at MCJ.[10] Thus, there can be no dispute that for purposes of liability under § 1983, the conduct of Sheriff Rogers is also the conduct of the County with respect to jail operations. See Myers, supra, at 1319; Pembaur, 475 U.S. at 481. While Plaintiff acknowledges this § 1983 action must be brought against the County because Sheriff Rogers is the final policymaker for MCJ,[11] he also argues that the County is separately liable under § 1983 because it is "responsible for

---

[10] Under Oklahoma law, the County has no statutory duty to hire, train, supervise, or discipline county sheriffs or their deputies. The County is, however, required to inspect jails at least once a year to examine conditions. Okla. Stat. tit. 57, § 1. Nevertheless, in Oklahoma the sheriff is ultimately responsible for the proper management of the jail in his county and the conduct of his deputies. Id. §§ 47, 52, 54; Okla. Stat. tit. 19, §§ 513, 547(A);

[11] To sue a county in Oklahoma, a plaintiff must name as a defendant the "Board of County Commissioners of the County" or, if appropriate, the relevant county officer in his or her official capacity. Okla. Stat. tit. 19, § 4,

providing the physical jail structure." [Doc. 85 at 17 (*citing* Okla. Stat. tit. 57, § 51)].[12] The County breached this statutory duty, according to Plaintiff, by approving contracts to house Lighthorse arrestees, by failing to allocate funds for improvements and/or expansion, by not building a new county jail, and by failing to allocate additional funds for hiring. [*Id*. at 17-19]. He further claims the County's actions and inactions caused or contributed to overcrowding, understaffing, inadequate jail facilities, insufficient surveillance systems, and an inability to segregate intoxicated inmates in accordance with official jail policy. [*Ibid*.].

Plaintiff appears to suggest that the County also has final policymaking authority through its control of jail funding and, therefore, was equally responsible for the jail policies and practices that gave rise to the injuries alleged. Oklahoma law, however, clearly sets out the roles of the Sheriff and the County. *See* Okla. Stat. tit. 19 §§ 339, 513, 547. Unless the County voluntarily undertook responsibility for hiring, supervising, and promulgating jail policies – which is not alleged – the County was not "affirmatively linked" with the any constitutional deprivations. Plaintiff has failed to provide any evidence showing the County assumed responsibility for operating MCJ or for the training and/or supervision of jail personnel. He merely claims that since the County has control over jail funding and is statutorily responsible for "warming the county jail" and "mak[ing] such repairs as may be prescribed by the district judge or the State Department of Health" pursuant to Okla.

---

[12] Okla. Stat. tit. 57, § 51 provides in pertinent part that "[i]t shall be the duty of the county commissioners . . . to provide suitable means for warming the county jail and its cells or apartments, beds and bedding, and such other permanent fixtures" and "to make such repairs as may be prescribed by the district judge or the State Department of Health."

Stat. tit. 57, § 51, the County therefore has shared control over all MCJ policies and procedures.

Alternatively, Plaintiff alleges the challenged practices and conditions at MCJ were widespread and the County had full knowledge of the same. Plaintiff, however, fails to show that the purported need for corrective action was so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the County was deliberately indifferent to the need. *See* Canton v. Harris, 489 U.S. 378, 390 (1989). Plaintiff has failed to show how the County's alleged failure to remedy the challenged practices and conditions at the jail, of which fell within the Sheriff's realm of statutory responsibility, directly resulted in a violation of his constitutional right to safety. The County's request for summary judgment is therefore granted. The Court again notes that, for purposes of liability under § 1983, the conduct of Sheriff Rogers is also the conduct of the County with respect to jail operations. *See* Myers, 151 F.3d at 1319; Pembaur, 475 U.S. at 481. Thus, the County may be held liable if Plaintiff prevails on his § 1983 claim against the Sheriff in his official capacity.

### 2.   As Applied to Sheriff Rogers, Officially

Plaintiff's § 1983 claim against Sheriff Rogers for failure to protect is braced by a slew of distinct accusations. Specifically, Plaintiff alleges that the Sheriff (a) failed to ensure jailers properly classified and separated intoxicated inmates, such as Hurt, from the general population at MCJ; (b) failed to adequately staff the jail and ignored chronic overcrowding; (c) failed to adequately train jailers; and (d) should have direct jailers to remove Plaintiff's orthotic boot from his cell on a nightly basis.

According to Plaintiff, Sheriff Rogers' deliberate indifference to these known conditions was the moving force behind the deprivations alleged.

### a. *Failure to Classify and Separate Intoxicated Inmates*

MCJ maintained written policies and procedures for booking intoxicated inmates, of which provide in pertinent part:

> If the injury, illness, or emotional state of the inmate appears serious, the staff shall contact the jail administrator and: [] refuse acceptance of custody and recommend that the arresting officer seek medical attention for the inmate [or] [] not accept custody until the arresting officer provides documentation of the inmate's medical treatment.

> Inmates requiring detoxification or booked on drug use charges will be placed in a holding cell for 6 to 12 hours or until sober and observed every 30 minutes.. . . The inmate will not be placed in the general population unit until after this time period.

[Doc. 85-8 at 13, § 2-3(2)-(3)]. MCJ also had more specific procedures regarding how to classify and house inmates [*Id.* at 22, § 3-1], as well as what measures must be taken when an inmate requires separation from the general inmate population.

> Administrative Segregation shall be employed to separate from the general population who . . . pose a serious threat to themselves and/or others[.]

> The recommendation to administratively segregate an inmate shall be referred to the jail administrator. Identification of such inmates shall be made as follows: [] Each staff member has the responsibility to observe the behavior of each inmate and identify those who meet the criteria listed above.

[*Id.* at 25, § 3-3]. Plaintiff make several arguments with respect to his contention that Sheriff Rogers knowledge of and acquiescence to his jailers ignoring official classification and detoxification policies presented a substantial risk of serious harm to inmates at MCJ.

First, Plaintiff argues that official policy required that Officer Russell classify Hurt with a history of violent or disruptive behavior and with evidence of mental disability. [Doc. 85 at 21; Doc. 85-8 at 22, § 3-1]. Plaintiff misconstrues the deposition testimony of Admr. Holman to support this conclusory allegation, however.[13] The record indicates that Hurt had never been physically violent at MCJ prior to assaulting Plaintiff,[14] and that Hurt has never been diagnosed with a mental disability. Plaintiff essentially contends that Officer Russell should have classified Hurt with a nonexistent history of physical violence and an undiagnosed mental disability.

Next, Plaintiff argues that Officer Russell should have followed official policy by placing Hurt in a segregated holding cell upon booking, as he was admittedly under the influence of wasp spray. [Doc. 85 at 22; Doc. 85-8 at 13, § 2-3]. The record shows that, in accordance with § 2-3(1) of MCJ policy, Officer Russell observed the physical condition and behavior of Hurt and determined he was fit for incarceration. [Doc. 83-12 at 7 (31:9-15)]. Though § 2-3(3) of MCJ policy requires that inmates booked under the influence of drugs be placed in a holding cell until sober, the only

---

[13] Plaintiff asserts Admr. Holman testified that "Hurt should have been classified as a history [sic] of violent or disruptive behavior and mental issues[.]" [Doc. 85 at 22 (*citing* Doc 85-10 at 7-8 (23-24)]. But the cited testimony contains only an affirmative, two-word response – *i.e.*, "Yes, sir" – to the following questions: (1) "Mr. Hurt did have a history of violence or aggression being able to flip a switch and go aggressive; correct?"; and (2) "It may not have been diagnosed, but people were under the impression [Hurt] might have some mental disability or mental issues going on?" [Doc. 85-10 at 7 (23:13-21)].

[14] It is undisputed that Hurt was typically booked while intoxicated and had been previously booked while under the influence of wasp spray. Though Hurt's demeanor during his many bookings at the Jail ranged from jovial to agitated and/or angry, he had never been physically violent with staff or inmates at the Jail. Plaintiff himself testified that he had never known Hurt to be violent. [Doc. 83-3 at 32 (108:2-17)].

holding cell at MCJ was occupied at the time Hurt was booked. Rather than contact Admr. Holman or the Sheriff to inquire into whether Hurt should be released or placed in the general population [Doc. 83-12 at 7 (31:8-11)], Officer Russell placed Hurt in the north cell with Plaintiff and two other inmates – all of whom had previously shared cells with Hurt without incident. [*Id.* at 7-8 (31:17-33:19)]. In any event, as it is undisputed that the single holding cell at MCJ was typically unavailable, Plaintiff has sufficiently established a custom maintained by jailers of ignoring official inmate detoxification procedures.[15]

Plaintiff has nevertheless failed to draw any link between this custom and Sheriff Roger's actual knowledge of and deliberate indifference to a serious risk that an intoxicated, yet historically nonviolent, detainee would attack Plaintiff upon being placed in the north cell. There is nothing in the record to indicate that the Sheriff – or Officer Russell for that matter – knew Hurt was so intoxicated that he posed a danger to himself or others, appreciated the risk caused by assigning Hurt to the north cell with other inmates, and then deliberately disregarded Hurt's mental state and the associated safety risks. And it cannot be said that Sheriff Rogers was deliberately indifferent to a known risk that the custom of ignoring segregation procedures posed to inmates because, in the decade prior to the incident at issue, only a few minor tussles between inmates occurred at MCJ. [Doc. 83-4 at 13 (109:7-17);

---

[15] For a municipality to be held liable for an unofficial policy under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law," and "[i]n order to establish a custom, the actions must be persistent and widespread . . . practices of [county] officials." Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) (internal quotations and citations omitted); *see* Church v. City of Hunstville, 30 F.3d 1332, 1345 (11th Cir. 1994) (noting that "random acts" and "isolated incidents" are typically insufficient to establish a widespread, permanent custom).

Doc. 83-17 at 12 (60:4-15); Doc. 83-19 at 2-3]. *See* <u>Winton</u>, 88 F.Supp.2d at 1260 (*quoting* <u>Farmer</u>, 511 U.S. at 842-43) (to prove actual knowledge on the part of a defendant-official, an Eighth Amendment plaintiff must "present[] evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past").

Viewing the record in a light most favorable to Plaintiff, the Court finds that there is insufficient evidence from which a reasonable jury could conclude that Sheriff Rogers was actually aware of a significant risk of harm to inmate safety at MCJ, that he failed to take reasonable steps to abate the risk, and that the jailers' custom of failing to follow official classification and segregation policies was the moving force behind the conditions which gave rise to Hurt's assault on Plaintiff.

### b. *Overcrowding / Understaffing*

Plaintiff has provided evidence to support his allegations that the Oklahoma State Department of Health ("OSDH") has "documented widespread and pervasive denial" by MCJ concerning its noncompliance with "federally mandated minimum cell space"[16] and capacity restrictions. [Doc. 85 at 21; Doc. 85-11]. While Plaintiff relies on page 53 of Hurt's deposition to support his allegation that Hurt was agitated by an overcrowded cell, Plaintiff failed to attach page 53 to his response in opposition to summary judgment. In any event, Hurt testified that he assaulted Plaintiff

---

[16] The Court notes that Plaintiff has provided no authorities setting forth the "federally mandated minimum cell space." *See* <u>Rhodes</u>, 452 U.S. at 371 n.4 (Marshall, J., dissenting) (compiling federal standards for minimum cell space).

because Plaintiff continued making a whistling and/or scraping noise with his inhaler after being asked to stop. [Doc. 83-9 at 7-9 (36:21-38:17)].

In determining whether overcrowding violates a constitutional right, the Court must not simply look to the fact of overcrowding, but rather the aggregate effect. *See* Rhodes, 452 U.S. 337. Mere discomfort which poses no risk to health and safety does not implicate the Eighth Amendment. *See* Hudson v. McMillian, 503 U.S. 1, 9 (1992). According to an OSDH inspection of MCJ in May of 2017, the north cell within which Hurt assaulted Plaintiff is 323 square feet with 244.25 square feet of unencumbered space and a calculated capacity of 10 inmates. [Doc. 85-11 at 2]. A total of 4 inmates, including Plaintiff and Hurt, were housed in the north cell on the night at issue. [Doc. 83-12 at 7-8 (31:24-32:16)]. The Court finds that the census and floor space in the north cell at the time of Hurt's assault complied with both state and federal standards.[17] Even if the north cell had been overcrowded at the time of Hurt's assault, Plaintiff has pointed to no evidence that could show Sheriff Rogers was aware that overcrowding at MCJ would result in an inmate-on-inmate assault and was deliberately indifferent to such risk.

Plaintiff also alleges that MCJ was understaffed the night he was assaulted. He contends Sheriff Rogers knew MCJ was insufficiently staffed – posing a safety risk to prisoners – and failed to take steps to remedy the situation. [Doc. 85 at 25].

---

[17] *See* [Doc. 85-11 at 2 (*citing* Okla. Jail Standard 310:670-5-11(a)(2) ("All cells and living areas shall have at least forty (40) square feet of floor space for the initial prisoner and at least twenty (20) square feet of floor space for each additional prisoner occupying the same cell. Double-celling of prisoners is permitted if there is at least sixty (60) square feet of floor space for two (2) persons.")]; *see also* Rhodes, *supra*, at 371 n. 4.

Defendants contend there is no evidence that additional staff would have prevented the attack from occurring. [Doc. 88 at 4]. Although Plaintiff presents evidence that MCJ previously received violation notifications from OSDH regarding insufficient staffing, he has failed to show how the Sheriff's alleged failure to properly staff MCJ *caused* Hurt to assault him. The record indicates that Officer Russell promptly responded to distress calls emanating from the north cell and separated Hurt from the other inmates. Even if a jailer had been standing watch in front of the north cell, this Court cannot reasonably conclude that said jailer could have prevented the attack because Hurt hit Plaintiff with the boot only *once*. Moreover, Plaintiff cites no authority in support of the proposition that an understaffed jail can create a dangerous situation for inmates.

Viewing the record in a light most favorable to Plaintiff, the Court finds that there is insufficient evidence from which a reasonable jury could conclude that Sheriff Rogers was actually aware of a significant risk of harm to inmate safety at MCJ, that he failed to take reasonable steps to abate the risk, and that the alleged understaffing at MCJ was the moving force behind the conditions which gave rise to Hurt's assault.

### c.   *Failure to Adequately Train Jail Staff*

There are highly limited circumstances where inadequacy in training can be a basis for § 1983 liability. *See* Canton, 489 U.S. at 388. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011) (citation omitted). Only where a failure to train "reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a

city be liable for such a failure under § 1983." <u>Canton</u>, *supra*, at 389. To establish a failure to train on the part of Sheriff Rogers, Plaintiff must prove three things: (1) the existence of a jail policy or custom involving deficient training; (2) the policy or custom's causation of an injury; and (3) the adoption of the policy or custom with deliberate indifference. <u>Lance v. Morris</u>, 985 F.3d 787, 800 (10th Cir. 2021).

On the first element, Plaintiff contends that there "was no formal training program in place" at MCJ. [Doc. 85 at 23-24]. As his summary judgment evidence includes an official jail policy on staff training [Doc. 85-8 at 4-5, § 1-2], the Court presumes Plaintiff is alleging a custom of deficient training. As evidence of this purported custom, Plaintiff points to various portions of Officer Russell's deposition testimony and the undisputed fact that he was the only jailer on duty on the night of October 16, 2021. To start, Officer Russell testified that he had never worked in a jail before beginning his employment at MCJ in June of 2021. [Doc. 84-5 at 9-10 (8:9-9:12), 16 (10:16-18)]. His initial training at MCJ consisted of shadowing Admr. Holman and another jailer for "a week of two." [*Id*. at 15 (13:2-19)]. While Plaintiff attempts to attribute deficiencies in Officer Russell's initial training to the Sheriff, the record indicates new jailer training was provided by the Oklahoma Sheriff's Association, not the Murray County Sheriff's Office. [Doc. 83-17 at 10 (11-20)]. Officer Russell did not receive new jailer training because the Oklahoma Sheriff's Association did not provide such training during the COVID pandemic. [Doc. 83-4 at 11-12 (105:15-106:11); Doc. 83-17 at 10 (50:11-23)].

Next, Plaintiff contends that Officer Russell "never felt confident on the job" and "never felt like he knew the policies and procedures" at MCJ. [Doc. 85 at 23 (*citing* Doc. 85-4 at 25 (71:13-20)]. Sheriff Rogers argues that whether Officer Russell ever felt confident with regard to jail policies is irrelevant. [Doc. 88 at 12]. Indeed, that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability under § 1983, for the officer's shortcoming may have resulted from factors other than a faulty training program. Canton, 489 U.S. at 390-91 (citations omitted). Moreover, the record suggests that annual jailer training was provided by OSDH, not the Murray County Sheriff's Office. [Doc. 83-4 at 11 (105:12-14)]. Like the Oklahoma Sheriff's Association, OSDH did not provide annual jailer training during the COVID pandemic. Doc. 83-4 at 11-12 (105:15-106:11); Doc. 83-17 at 10 (50:11-23)]. As he began working at MCJ three months before Hurt assaulted Plaintiff, Officer Russell had not yet received annual jailer training from the Oklahoma Sheriff's Association.

As stated, inadequacy in training may serve as the basis for liability under § 1983 "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." Canton, 489 U.S. at 389. There is no evidence in the record that Sheriff Rogers deliberately failed to train jailers, including Officer Russell. In fact, Admr. Holman was responsible for training jailers on official MCJ policy, of which was provided to the best of Admr. Holman's ability. [Doc. 83-17 at 10 (50:4-10)]. Plaintiff has also failed to establish a "custom" of insufficient training at MCJ.[18] Viewing the record in a light most favorable to Plaintiff, the Court finds that there is insufficient

---

[18] *See, supra*, n.15.

evidence from which a reasonable jury could conclude that Sheriff Rogers was actually aware of a significant risk of harm to inmate safety at MCJ, that he failed to take reasonable steps to abate the risk, and that his alleged failure to train jail staff was the moving force behind the conditions which gave rise to Hurt's assault.

### d.   The Orthotic Boot

Finally, Plaintiff contends that official jail policy regarding prosthetic devices was ignored and allowed for Hurt to assault Plaintiff with his orthotic boot. [Doc. 85 at 24]. This official policy provides in relevant part:

> Inmates who are admitted wearing prosthetic devices will have those devices searched. The following steps will be taken:
>
> a. Inspect the device and review the inmate's file to determine whether or not the device itself or the inmate's history and behavior with the device pose any security risk.
>
> b. If a security risk exists, consult with the facility administrator to determine the inmate's medical need for the device. If the facility administrator decides that the inmate's health will not be jeopardized by the removal of the device during confinement, the device will be removed, tagged and stored.

[Doc. 85-8 at 47, § 6-9(2)(a)-(b)].

The record indicates that Plaintiff was prescribed to wear the walking boot for two weeks, except when sleeping and showering.[19] The record does not indicate that a safety search of Plaintiff's boot was performed by jailers in accordance with § 6-9(2) of MCJ policy. As the boot was plastic and contained metal rods, jailers could have determined the device posed a security risk. [Doc. 85-7 at 20 (73:9-22)]. Plaintiff

---

[19] Jail staff had difficulty scheduling a two-week follow-up appointment for Plaintiff because the Chickasaw Nation Medical Center was "too busy." [Doc. 83-7 at 8 (76:1-25)]. When the medical center finally called to schedule an appointment for Plaintiff, Hurt had already assaulted him with the orthotic boot. [*Ibid.*].

testified, however, that he was never concerned the boot could be used as a weapon against him and "would have slept with [the boot] on" if he had such concerns. [Doc. 83-3 at 28 (97:5-8, 22-15)]. In addition, it is undisputed that there were no prior instances of inmates taking possession or control of Plaintiff's orthotic boot; Admr. Holman testified that all jail personnel were aware Plaintiff was prescribed an orthotic boot and that jailers conducted their nightly cell checks on an hourly basis [Doc. 85-7 at 21 (74:7-13)]; and Sheriff Rogers testified that he never discussed the handling of Plaintiff's boot with any jailers, as this issue fell within Admr. Holman's domain of responsibility pursuant to official jail policy. [Doc. 83-4 at 5-6 (18:17-19:21); Doc. 85-8 at 47, § 6-9(2)(a)-(b)].

Plaintiff nevertheless contends that "jail policy was ignored" because his boot should have been removed on a nightly basis. [Doc. 85 at 24]. But the policy at issue provides that, if Admr. Holman determines the dangers of a prosthetic device outweigh the inmate's need for the same, the device must be removed during the entire course of that inmate's confinement. *See* [Doc. 85-8 at 47, § 6-9(2)(b)]. Plaintiff has painted himself in a corner by arguing that jailers ignored § 6-9(2) because jail staff did not arbitrarily deviate from § 6-9(2).

Viewing the record in a light most favorable to Plaintiff, the Court finds there is insufficient evidence from which a reasonable jury could conclude that *Sheriff Rogers* was actually aware of a significant risk of harm that Plaintiff's orthotic boot posed to inmate safety at MCJ, that he failed to take reasonable steps to abate the risk, and that the jailers' alleged custom of failing to follow the official prosthetic

device policy in accordance with Plaintiff's preferred method of deviation from said policy was the moving force behind the conditions which gave rise to Hurt's assault. Sheriff Rogers is therefore entitled to summary judgment in his official capacity on the § 1983 claim asserted against him.

## V.    PLAINTIFF HAS NO REMAINING CLAIMS

Having carefully reviewed the complaint in a light most favorable to Plaintiff, the Court finds no apparent connection between the allegations therein to any discernible claim against defendant Hurt. As stated, counsel for Plaintiff conceded at the motion hearing on September 24, 2024 that Plaintiff has no claims under 42 U.S.C. §§ 1985 or 1988. Hurt cannot be held liable under Plaintiff's remaining § 1983 claim because, at all relevant times, he was a private citizen rather than a state actor. *See* Beedle v. Wilson, 422 F.3d 1059, 1071 (10th Cir. 2005) (*quoting* Dennis v. Sparks, 449 U.S. 24, 27 (1980)) (noting a private citizen cannot be held liable under § 1983 unless he was a "willful participant in joint action with the State or its agents."). The Court therefore concludes that Plaintiff has asserted no federal claims against Hurt.

Counsel for Plaintiff also voluntarily dismissed all state law claims asserted against the Board and Sheriff Rogers during the motion hearing. As noted, Plaintiff's complaint alleges that all defendants violated his rights under article II, § 30 of the Oklahoma Constitution and suggests a negligence claim against the Sheriff for violation of his duties under Okla. Stat. tit. 57, § 52.[20] Hurt cannot be held liable

---

[20] Okla. Stat. tit. 57, § 52 provides in relevant part that "[i]t shall be the duty of the sheriff of each county to provide bed clothing, washing, board and medical care when required, and all necessities for the comfort and welfare of prisoners . . ."

under the latter claim, as he is not a sheriff with duties prescribed by Oklahoma law. Plaintiff's only remaining claim is an excessive force action brought under article II, § 30 of the Oklahoma Constitution pursuant to *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013), *superseded by statute as stated in* <u>Barrios v. Haskell Cnty. Pub. Fac. Auth.</u>, 432 P.3d 233 (Okla. 2018). [21] *See* [Doc. 2, §§ XI-XII]. Even if *Bosh* excessive force actions were still viable, Hurt cannot be held liable under such claim because, at all relevant times, he was a private citizen rather than a state actor. Consequently, the Court finds that Plaintiff has failed to assert any discernible state claims against Hurt.

## VI.    CONCLUSION

While it may reasonably be inferred that the County, Sheriff Rogers and/or his subordinates were negligent in their fulfillment or non-fulfillment of relevant duties prescribed by Oklahoma law, the Oklahoma Jail Standards and/or official MCJ policy, the Court concludes that the municipal defendants' challenged conduct does not rise to the level of a deliberately indifferent violation of Plaintiff's constitutional right to be free from cruel and unusual punishment. Furthermore, while Plaintiff could have brought a state claim for assault against Hurt and potentially recovered

---

[21] In 2014, "the [Oklahoma] Legislature . . . responded to *Bosh* by amending the [Oklahoma Governmental Torts Act ("OGTCA")] to specify that the State's immunity from suit extended even to torts arising from alleged deprivations of constitutional rights." <u>Barrios</u>, 432 P.3d at 238; *see* <u>Okla. Stat. tit. 51, § 152(14)</u> (re-defining "tort" to include violations of the "Constitution of the State of Oklahoma"); <u>*Id.* § 153(B)</u> (providing that liability of a political subdivision under the OGTCA "shall be exclusive and shall constitute the extent of tort liability of the state, a political subdivision or employee arising from common law, statute, the Oklahoma Constitution, or otherwise."). As noted in *Barrios*, the 2014 amendment effectively abrogated the *Bosh* claim by extending governmental immunity to so-called constitutional torts. *See* <u>Barrios</u>, *supra*, at 244.

under the same, the Court concludes that Plaintiff's complaint contains no discernible state or federal claims against Hurt.

**IT IS THEREFORE ORDERED** that the joint motion for summary judgment of defendants Darin Rogers, in his official capacity as Murray County Sheriff, and the Murray County Board of County Commissioners [Doc. 83] is granted.

**IT IS FURTHER ORDERED** that defendant Robert Dale Hurt is terminated as a party.

**DATED** this 29th day of October, 2024.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE